# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

№ 25-CV-0904 (RER) (JRC)

———————————————

AUDLEY REID

VERSUS

NINA REMEKIE

———————————

**MEMORANDUM & ORDER**

June 26, 2025

———————————

**RAMÓN E. REYES, JR., District Judge:**

Before the Court is the petition of Audley Reid ("Petitioner") pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1988 WL 411501 (July 1, 1988), and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq.* Petitioner alleges respondent Nina Remekie ("Respondent"), mother of the parties' two minor children, A.A.F.R. and A.A.-A.R., wrongfully removed the children from Jamaica to New York on January 24, 2025. Petitioner seeks to have the two children returned to Jamaica. The Court held a three-day bench trial on May 1, 2, and 6, 2025, at which Petitioner sought to establish his prima facie case for wrongful removal, including that Jamaica was the children's habitual residence as of the time of removal. Respondent disputed Jamaica as the habitual residence and sought to establish that, even if it were, the children would face a grave risk of harm if returned to Jamaica.

After carefully reviewing the record, and for the reasons set forth herein, the Court finds that Petitioner has established his prima facie case by a preponderance of the evidence, including that Jamaica was the children's habitual residence; and that Respondent has failed to establish by clear and convincing evidence that the children would face a grave risk of harm were they returned to Jamaica. The Court therefore GRANTS the petition and orders the return of A.A.F.R. and A.A.-A.R. to Jamaica.

## **BACKGROUND**

I.      Jurisdiction

A petition for the return of the minor children, A.A.F.R. and A.A.-A.R., has been filed with this Court pursuant to the Hague Convention and ICARA. The minor children are currently located in the State of New York, Queens County. (ECF No. 1, Petition ("Pet.") ¶ 7). Born in 2021 and 2023, the minor children are both under the age of sixteen; therefore, the Convention applies. (*Id.* ¶¶ 1, 6); Convention, art. 4. Because Jamaica, the country from which the minor children were removed, is a contracting state to the Convention and a treaty partner with the United States, the Convention is in force between the two countries. *See International Parental Child Abduction*, U.S. Embassy in Jamaica, https://jm.usembassy.gov/international-parental-child-abduction. The Court thus has jurisdiction over this case. 22 U.S.C. §§ 9001, 9003; 28 U.S.C. § 1331.

II.     Findings of Fact[1]

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court finds the following facts based on its review of the trial record, including live testimony, documentary exhibits

---

[1] To the extent that any finding of fact reflects a legal conclusion, it shall be deemed a conclusion of law to that extent, and vice versa. *See Miller v. Fenton*, 474 U.S. 104, 113–14 (1985).

2

admitted at trial, and the parties' pre-trial joint proposed findings of fact and post-trial briefing. Unless otherwise indicated, the parties have established the following facts by a preponderance of the evidence.

A. Early Relationship, Birth of First Child, and Regular Trips to Jamaica: 2019–2022

Petitioner is a Jamaican citizen and resident and works as the chief executive officer of a family-run pharmacy in his hometown of Kingston, Jamaica. (Tr. 5/1/2025 7:23–8:1, 10:4–5). Respondent is a dual citizen of Jamaica and the United States and is a licensed social worker. (Tr. 5/1/2025 10:10–11; ECF No. 52, PX1[2]; Tr. 5/2/2025 334:4–6). Respondent is registered to vote in New York and has never registered to vote in Jamaica. (Tr. 5/2/2025 369:11–21). In 2019, Petitioner met Respondent at a social event in Washington, D.C. (Tr. 5/1/2025 6:9–18). At the time, Respondent lived in New York City and worked as a school social worker. (Tr. 5/1/2025 7:20–21, 8:4–8). The two began a casual romantic relationship in 2020, with Respondent visiting Petitioner in Jamaica a few times that year. (Tr. 5/1/2025 6:21–7:10, 8:9–25; Tr. 5/6/2025 530:18–23). After Respondent discovered she was unexpectedly pregnant with Petitioner's child in late 2020, the relationship became more serious, despite the parties living in different countries. (Tr. 5/1/2025 17:14–19, 18:7–11). A few times during the pregnancy, Petitioner flew from Jamaica to New York City to accompany Respondent to prenatal doctor's appointments. (Tr. 5/1/2025 17:24–18:1, 128:18–21). In August 2021, Respondent gave birth to their daughter, A.A.F.R., in New York. (Tr. 5/2/2025 367:21–22, 368:3–6).

---

[2] Petitioner's exhibits are cited as "PX" followed by the exhibit number. Respondent's exhibits are cited as "RX" followed by the exhibit letter.

In late 2020 or early 2021, with input from Respondent, Petitioner purchased a house with space for Respondent and their daughter in Kingston, Jamaica. (Tr. 5/1/2025 19:23–21:1, 135:19–21). Starting in September 2021 and continuing through 2024, Respondent helped decorate the home, weighing in on paint colors, furniture, and curtains, and shipping items for the children and the home from New York to Jamaica. (Tr. 5/1/2025 196:16–24, 197:5–25, 198:9–23; Tr. 5/6/2025 522:12–23).

Respondent's first three trips with A.A.F.R. to visit Petitioner in Jamaica were on December 11, 2021, March 18, 2022, and May 13, 2022. (Tr. 5/6/2025 531:2–15; ECF No. 53, PX3). During this time, Respondent and her daughter lived in New York City at Respondent's parents' home. (Tr. 5/2/2025 367:9–12, 367:25–368:2). As a school social worker, Respondent did not work during the summer. (Tr. 5/6/2025 531:16–19). In June 2022, Respondent and A.A.F.R. stayed with Petitioner at his home in Jamaica for a couple months during the school's summer break. (*Id.*; ECF No. 53, PX3). At some point in 2022, Respondent discovered she was pregnant with the couple's second child. (*See* Tr. 5/1/2025 106:19–22). Respondent and A.A.F.R. visited Petitioner for a few days in both September 2022 and November 2022. (Tr. 5/6/2025 531:20–23; ECF No. 53, PX3).

B. <u>Birth of Second Child and Maternity Leave in Jamaica: 2023</u>

Respondent gave birth to the couple's second child, A.A.-A.R., in February 2023 in New York. (Tr. 5/2/2025 367:23–24, 368:7–8). In May 2023, Respondent flew with both children to Jamaica to spend the summer there with Petitioner, using some of her maternity leave from her employer to extend her school's summer break. (Tr. 5/1/2025 29:25–30:4; Tr. 5/2/2025 381:15–19; Tr. 5/6/2025 531:24–532:3; ECF No. 53, PX3; ECF No. 55, PX5). Over the summer, the parties enrolled their children at Step by Step in

4

Kingston, Jamaica, for daycare [3] and summer camp. (Tr. 5/1/2025 27:21–29:3; Tr. 5/2/2025 394:3–16). The children received medical and dental care in Jamaica and became involved in various community activities. (Tr. 5/1/2025 61:22–62:20, 90:7–92:5; ECF No. 68–73, PX18–PX23). In summer 2023, Respondent applied for and received Jamaican citizenship and passports for herself and both children. (Tr. 5/1/2025 30:22–31:20). She also was seeking remote employment in the United States or employment in Jamaica but was unsuccessful. (Tr. 5/1/2025 33:15–34:13). At one point that summer, Respondent took a "girls trip" to Cancun, leaving the children with Petitioner. (Tr. 5/1/2025 32:19–33:14).

The parties had two physical altercations in summer 2023: In June 2023, during an argument, Petitioner pushed Respondent to the bed three times and prevented her from leaving the bedroom; in August 2023, Petitioner became angry with Respondent for not watching the children carefully enough and grabbed her phone from her hand while she was speaking to her mother. (Tr. 5/1/2025 98:23–101:2; Tr. 5/2/2025 419:18–423:2).

At the end of the summer, Respondent returned to New York with the two children, to return to her social work job for the fall semester, with a brief trip back to Jamaica in October 2023. (Tr. 5/2/2025 376:13–377:21). In early December 2023, Respondent and the children visited Jamaica for the Christmas holidays. (Tr. 5/2/2025 385:3–386:6). During this time, the parties were engaged in discussions about Respondent and the children potentially moving to Jamaica permanently. (Tr. 5/1/2025 39:9–43:17, 46:11–

---

[3] Throughout the trial and his various moving papers, Petitioner refers to Step by Step, the institution the children attended in summer 2023 and in 2024, as "school." Given the children's young age, the Court deems this institution more appropriately termed "daycare." *See* Tr. 5/2/2025 393:22–394:2.

5

49:14; Tr. 5/2/2025 386:8–388:14; ECF No. 74, PX24 (12/1/2023 email from Petitioner to Respondent); ECF No. 75, PX25 (12/20/2023 email from Respondent to Petitioner); ECF No. 76, PX27 (1/5/2025 email from Respondent to Petitioner laying out "Plan A" and "Plan B" in the event she did or did not get a remote job or job in Jamaica by early 2024)). Respondent was hesitant to move to Jamaica without a job—specifically, without a job that met her salary and career goals. (*See* ECF No. 75, PX25 at AR000066–67). The parties dispute whether they ever agreed what Respondent and the children would do if she was unable to secure a suitable job. (*Compare* Tr. 5/1/2025 164:8–13, 190:13–193:3, *with* Tr. 5/2/2025 391:18–392:16, 532:4–12).

C. Life in Jamaica: 2024

In early January 2024, Respondent flew back to New York to resign in person from her New York-based school social work job because she wanted to avoid "burning bridges." (ECF No. 75, PX25 at AR000056; Tr. 5/1/2025 46:22–25). At the principal's recommendation, around February or March 2024 Respondent took a leave of absence from her job, rather than resign. (Tr. 5/2/2025 413:1–4). While she was in New York, the children remained with Petitioner in Jamaica. (Tr. 5/1/2025 49:15–19). Respondent visited Jamaica a couple times between January and March 2024, including for their son's first birthday. (Tr. 5/1/2025 48:23–49:1, 52:5–14, 155:23–156:6). Having failed to secure suitable employment, Respondent returned to Jamaica in early March 2024 but continued applying for remote U.S.- and Jamaican-based positions, and jobs located in Jamaica. (Tr. 5/6/2025 535:3–11, 536:10–537:15, 538:11–543:19; ECF No. 80–81, PX32–PX33). Respondent also discussed with Petitioner the possibility that she might open a children's play space or luxury bridal shop in Jamaica and, at Petitioner's urging, created business

plans. (Tr. 5/1/2025 60:8–61:7; Tr. 5/6/2025 537:16–538:10). She applied for a Jamaican taxpayer registration number (TRN) and considered applying to the Culinary Institute of Jamaica for a baking and pastry culinary arts course. (Tr. 5/6/2025 543:20–544:546:14). In April or May 2024, Respondent was hired as a remote social worker at Pariva Health. (Tr. 5/1/2025 55:25–56:18, 175:15–19; Tr. 5/6/2025 536:23–537:4). She rented temporary office space in Kingston and worked both at this office and at home. (Tr. 5/1/2025 57:3–11).

In May 2024, Respondent accused Petitioner of hiding the children's Jamaican and U.S. passports from her while she was in New York; Petitioner claimed he had merely moved the passports from the house to a safe in his office for safekeeping. (ECF No. 110, PX28-F at AR001795; Tr. 5/1/2025 168:3–8; Tr. 5/2/2025 404:20–407:12). Respondent emailed the U.S. Embassy and Department of State on April 24, 2024, to request assistance in retrieving the passports, alleging she was in an abusive relationship and that Petitioner was refusing to give her the children's passports. (ECF No. 93, RXC; Tr. 5/2/2025 409:11–16). At some point after a joint therapy session in May 2024, Petitioner returned the passports to the home, where Respondent placed them in a mutually accessible lockbox. (Tr. 5/2/2025 176:11–177:10; Tr. 5/6/2025 415:25–416:6).

Respondent and the children took two trips to the United States during the summer of 2024: a two-week trip to Florida and Disney World in July 2024, and a one-week trip to New York in September 2024. (Tr. 5/1/2025 68:11–18, 69:7–13, 82:16–83:4, 215:7–16, 216:2–13). These trips were without Petitioner and with Respondent's family. (Tr. 5/2/2025 315:8–317:8). Aside from these two trips—totaling three weeks—the children remained in Jamaica for all of 2024. (*See* ECF No. 54, PX4; ECF No. 56, PX6). They

continued to attend Step by Step daycare and summer camp, engage in extracurricular activities and various cultural and family events, and receive medical and dental care in Jamaica. (Tr. 5/1/2025 49:15–19, 53:10–22, 63:1–17, 65:13–66:4, 68:11–12, 68:19–69:6, 69:14–70:22, 89:11–22, 90:7–92:10; ECF Nos. 59–73, PX9–23). They regularly visited family members in Jamaica on both Petitioner's and Respondent's sides of the family: For example, every Sunday Petitioner's sister would comb or braid A.A.F.R.'s hair. (Tr. 5/1/2025 80:23–81:15, 81:24–82:12, 248:4–8, 248:20–23).

On December 26, 2024, the parties got into an argument over whether A.A.F.R. was permitted to wear a particular tutu that day. (Tr. 5/1/2025 101:16–17, 101:7–104:14; Tr. 5/2/2025 423:5–424:2, 423:3–427:3). In response to perceived insults about her parenting style and her own parents, Respondent pushed Petitioner, Petitioner pushed back, pushing her towards the couch, and Respondent landed on the ground. (Tr. 5/1/2025 103:6–18, 104:15–105:3; Tr. 5/2/2025 424:11–23). Respondent threw a child's play laptop at Petitioner's head. (Tr. 5/1/2025 103:18–20; Tr. 5/2/2025 424:23–24). Petitioner grabbed Respondent's shirt collar, which rubbed against her neck and caused bruising.[4] (Tr. 5/1/2025 103:20–104:4; Tr. 5/2/2025 424:24–425:1, 425:4–7). Eventually Petitioner's sister and mother, who witnessed the argument, told Petitioner to let Respondent go, which he did. (Tr. 5/1/2025 104:4–14; Tr. 5/2/2025 425:1–3). The parties' daughter observed at least some of this incident. (Tr. 5/1/2025 103:18–21; Tr. 5/2/2025 430:10–15). Respondent's aunt testified that she later saw and took a photo of the bruise

---

[4] The parties and witnesses refer to this neck injury variously as an "injury," "bruise," "laceration," "scar," "cut," and "ligature strangulation." On direct examination, Respondent called it, without prompting, a "bruise." (Tr. 5/2/2025 425:4–19). The Court adopts that terminology.

(Tr. 5/2/2025 352:19–355:5, 425:8–19; ECF No. 94, RXD (photos of bruising)), but Petitioner and his sister denied ever seeing any bruising (*See* Tr. 5/1/2025 187:17–188:1, 256:12–257:9; Tr. 5/2/2025 424:11–17). After the altercation, both Respondent and Petitioner filed police reports documenting the incident. (Tr. 5/1/2025 106:5–9; ECF No. 95, RXE (Respondent's police report)).

On January 24, 2025, Respondent picked up the children from daycare and, with the help of her mother, who had flown down from New York, and without Petitioner's knowledge, took the children to New York. (Tr. 5/1/2025 108:4–13; Tr. 5/2/2025 317:16–319:18). Since then, Respondent and the children have been living at Respondent's parents' home in Queens, New York. (Tr. 5/2/2025 367:9–12).

D. Credibility Determinations

As the finder of fact, the trial court assesses witnesses' credibility using a variety of factors, including the witness's demeanor and tone of voice, the testimony's internal and external consistency, and the inherent probability of the particular facts espoused by the witness in light of all other evidence. *See New York v. Adamowicz*, 16 F. Supp. 3d 123 (E.D.N.Y. 2014), *aff'd*, 609 F. App'x 19 (2d Cir. 2015); *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 670–71 (2d Cir. 2023).

The Court found Petitioner credible when testifying about his affection and devotion towards his children, as well as his self-professed affinity for discipline and control. The Court did not, however, find Petitioner credible when he testified about the altercation between the parties on December 26, 2024. Petitioner's demeanor, which up until that point had been calm and measured, or emotional when talking about his children, entirely shifted when asked about the incident. He appeared to the Court to be

agitated, shifting in his seat, becoming defensive. Considering Respondent's credible testimony that Petitioner was physically violent towards her on that day, the Court believes that Petitioner was likely trying to make himself appear more sympathetic. He minimized the conflict, blamed Respondent for having started the physical altercation, and denied ever having seen the bruising on her neck that Respondent alleges he caused when he grabbed her by the shirt collar.

The Court found Respondent to be largely not credible due to numerous inconsistencies in her testimony.[5] Respondent's testimony that she was trapped in Jamaica in 2024 and would have left sooner if she had had the children's passports is undermined by the fact that, once she received the children's passports in May or June 2024, she took two trips to the United States with the children and without Petitioner. Both times she voluntarily returned to Jamaica. Her testimony about the altercation on December 26, 2024, shifted: For instance, first she said she fell on the couch, but halfway

---

[5] The Court acknowledges the substantial social science research indicating that individuals alleging domestic violence often have their credibility questioned by courts, law enforcement, and others mediating access to protection. *See generally* Merle H. Weiner, *You Can and You Should: How Judges Can Apply the Hague Abduction Convention to Protect Victims of Domestic Violence*, 28 UCLA WOMEN'S L.J. 223 (2021). Domestic violence victims can seem to lack credibility for multiple reasons, including that: (1) traumatic brain injury caused by strangulation or battering can neurologically impair the person's brain function and memory, meaning the person might contradict themselves or fail to remember seemingly critical details about the abuse; (2) traumatic memories are created and stored in the brain differently than nontraumatic memories, often manifesting as disjointed, nonlinear, and impressionistic; (3) individuals who have not experienced domestic violence may not understand the cyclical nature of abuse and that survivors often act in counterintuitive ways, such as staying with an abusive partner; (4) symptoms of post-traumatic stress disorder "can make abused women appear hysterical, angry, paranoid, or flat and numb" whereas abusive men "tend to excel at presenting themselves as self-confident and in control"; and (5) derogatory stereotypes rooted in sexism, racism, classism, and other biases may unconsciously influence the decisionmaker's impression of the victim. Deborah Epstein & Lisa A. Goodman, *Discounting Women: Doubting Domestic Violence Survivors' Credibility and Dismissing Their Experiences*, 167 U. PA. L. REV. 399, 405–438 (2019). Nevertheless, after reviewing research on victim credibility, and comparing this case to similar case studies and case law, the Court finds that the primary reasons domestic violence victims are deemed incredible do not apply in this situation or have been appropriately factored into the Court's analysis.

through cross-examination, she insisted she had actually fallen on a chair. (Tr. 5/6/2025 528:10–23). Respondent's factual allegations regarding her life in New York and in Jamaica were detailed and credible; however, when she mentioned alleged abuse, her statements became conclusory: "emotional manipulation," "gaslighting," "hot and cold." (*E.g.*, Tr. 5/2/2025 431:4–9; Tr. 5/6/2025 499:7–13, 502:15–20, 503:3–16; ECF No. 98, RXI (answer to question 18 on the Danger Assessment: "Do you believe he is capable of killing you? 'absolutely'")). She often did not back up these conclusory statements with persuasive facts. Respondent repeatedly emphasized her frustration that the proceedings were not fair, but did not allege fear of Petitioner nearly as frequently. (Tr. 5/2/2025 401:22–402:3 ("Q: And if he is a good [dad], what are your reservations now about returning to Jamaica with the children? A: Now? Q: Yes. Now. As we sit here today. A: After putting me through all this, I mean, that's self-explanatory, I mean, *he's not being fair*, and it just speaks on the control." (emphasis added))). In response to being asked on direct examination how returning the children would disrupt their current routine in New York, Respondent stated that, here in New York, "My children are able to enjoy luxury without mommy having to feel undermined or without mommy having to ask permission." (Tr. 5/6/2025 519:13–14). The Court notes that Respondent does not express any credible fear that her children would face any harm upon return to Jamaica. (Tr. 5/2/2025 402:6–14 ("Q: . . . [W]hat fears do you have, if any, about the children being returned? A: *My fear is that they will not come back to me and that he wants all power over them*. Q: How do you believe that returning the children to Jamaica would [a]ffect your children's psychological well-being, if at all? A: Because [A.A.F.R.] has repeatedly said . . . daddy, you pushed mommy to the ground." (emphasis added))). Instead, she has consistently

11

stated he is a "great dad." (*E.g.*, Tr. 5/2/2025 401:11–12, 335:23–336:8; ECF No. 110, PX28-F at AR001788). And all witnesses who observed the children interacting with Petitioner noted the children seemed excited and happy to see him and exhibited no fear of him. (Tr. 5/1/2025 117:9–17; Tr. 5/2/2025 273:9–15; Tr. 5/6/2025 593:8–24).

The Court also found the testimony of Respondent's mother, Elaine Remekie, not credible. She, too, used conclusory statements to describe Petitioner and his behavior, including repeating "Would you tell your abuser that you're leaving?" in response to cross-examination asking her whether she told Respondent what to tell Petitioner when Respondent left Jamaica in January 2025. (Tr. 5/2/2025 318:25–319:7). On cross-examination, she paused for long periods of time before answering most questions and appeared to attempt to calculate her answers to paint her story in the best light, even if it meant contradicting herself.

The Court found the remaining fact witnesses to be largely credible: Elizabeth Riccio, LMSW, a licensed social worker who supervised one visitation between Petitioner and the children; Allyson Mitchell, a family friend of the parties; Jewel Reid, Petitioner's sister; Dr. Ellen Weld, a psychologist who supervised two visitations between Petitioner and the children; Simone Vaughn, Respondent's sister; and Beryl Harold, Respondent's aunt.

   E.  <u>Expert Witnesses</u>

   *i.*     *Respondent's Expert, Dr. Jacquelyn C. Campbell*

Respondent proffered Dr. Jacquelyn C. Campbell as an expert in the field of domestic violence homicide and the Danger Assessment.[6] A registered nurse, Dr. Campbell holds a B.S., M.S., and Ph.D. in Nursing, is a professor at Johns Hopkins University School of Nursing, and has published hundreds of articles on domestic violence and femicide. (ECF No. 97, RXH). She developed the Danger Assessment as a clinical tool to assess a domestic violence victim's risk of homicide at the hands of her[7] abusive partner. The Court found Dr. Campbell to be qualified as an expert in the areas of domestic violence homicide and the Danger Assessment. (Tr. 5/2/2025 448:14–15).

Dr. Campbell testified about the Danger Assessment generally as well as the impact of domestic violence in the home on children's psychological and physical wellbeing, and her observations and conclusions from administering the Assessment to Respondent on March 31, 2025. (Tr. 5/2/2025 449:9–450:8, 451:6–23, 458:1–6, 459:11–461:10). During her Danger Assessment evaluation of Respondent, Dr. Campbell determined that Respondent was in "severe danger" of being killed by Petitioner. (Tr. 5/2/2025 454:8–456:7; ECF No. 98, RXI; ECF No. 99, RXJ). Dr. Campbell checked "Yes" for eight factors on the Danger Assessment, including: "10. Does he ever try to choke/strangle you or cut off your breathing?" (ECF No. 98, RXI).[8] Notably, Dr. Campbell

---

[6] The Danger Assessment is an inventory of twenty questions asked to a domestic violence victim to assess her risk of being killed by her abusive partner. It is primarily used in clinical settings to provide information to the victim and is often accompanied by safety planning. *See generally* Amanda Hitt & Lynn McLain, *Stop the Killing: Potential Courtroom Use of A Questionnaire That Predicts the Likelihood That A Victim of Intimate Partner Violence Will Be Murdered by Her Partner*, 24 Wis. J.L. Gender & Soc'y 277 (2009).

[7] As Dr. Campbell noted, the Danger Assessment was designed based on data of female domestic violence victims and has not been validated for use on male victims. (*See* Tr. 5/2/2025 477:16–20). Any mention of "homicide" in the context of the Danger Assessment may therefore more accurately be termed "femicide."

[8] Dr. Campbell also checked "Yes" for: "1. Has the physical violence increased in severity or frequency over the past year?"; "3. Have you left him after living together during the past year?"; "7. Has he avoided being

did not provide a check mark for the follow-up to question 10: "10a. (If yes [to question 10 regarding strangulation], has he done it more than once, or did it make you pass out or black out or make you dizzy? check here:___)." (*Id.*) However, in scoring the Danger Assessment, Dr. Campbell added two points for question 10a, based on her subjective assessment that Respondent may not have remembered whether she was strangled to the point of blacking out. (Tr. 5/2/2025 490:24–491:18; ECF No. 99, RXJ). Dr. Campbell admitted that Respondent did not state in the interview that she ever blacked out as a result of Petitioner grabbing her by the shirt collar. (Tr. 5/2/2025 491:7–18). Nor does the Court determine, based on any witness's testimony or other evidence in the record, that Respondent did black out or become dizzy as a result of Petitioner grabbing her by the shirt collar. By incorrectly adding two additional points to the scoring, Dr. Campbell increased Respondent's risk score from 13 to 15, raising her danger level from "increased danger" to "severe danger." (Tr. 5/2/2025 491:24–492:6; ECF No. 99, RXJ). This rating of "severe danger" was a key piece of Respondent's argument for the grave risk defense (discussed *infra* under Conclusions of Law). While this rating alone does not determine whether Respondent is at risk of abuse, or whether the children face a grave risk of harm upon return to Jamaica, without it Respondent's already tenuous argument for grave risk to the children loses a key piece of support.

In a similar case in the Southern District, Judge Castel found that Dr. Campbell's "'danger assessment tool' is a crude but useful checklist for those who may come in

---

arrested for domestic violence?"; "13. Does he control most or all of your daily activities? For instance, does he tell you who you can be friends with, when you can see your family, how much money you can use, or when you can take the car?"; "14. Is he violently and constantly jealous of you?"; "18. Do you believe he is capable of killing you?"; "19. Does he follow or spy on you, leave threatening notes or messages, destroy your property, or call you when you don't want him to?" (ECF No. 98, RXI).

14

contact with victims of domestic violence" but concluded that "its predictive power in this case, however, is of minimal value." *Souratgar v. Fair*, No. 12 Civ. 7797 (PKC), 2012 WL 6700214, at *10 (S.D.N.Y. Dec. 26, 2012) (*Souratgar I*), *aff'd sub nom. Souratgar v. Lee*, 720 F.3d 96 (2d Cir. 2013) (*Souratgar II*). Judge Castel noted that the expert conducting the danger assessment did not examine the petitioner or the child, there was "no credible evidence" that petitioner owned a gun, and "[a]ll other factors were based upon self-reporting by respondent or her family members." *Id.* Similarly, here, Dr. Campbell did not examine Petitioner or either child (Tr. 5/2/2025 482:15–24), there is at best disputed evidence regarding whether Respondent was "choked" or "strangled" when Petitioner grabbed her by the shirt collar and caused bruising on her neck (Tr. 5/2/2025 485:10–18 (what Dr. Campbell referred to as a "ligature strangulation")), and all risk factors were self-reported by Respondent (Tr. 5/2/2025 456:13–24). Furthermore, Dr. Campbell failed to ask even basic follow-up questions to Respondent's answers to the checklist items and incorrectly scored the Danger Assessment based on her own subjective assumptions about Respondent's answers. (Tr. 5/2/2025 490:24–491:18). Ultimately, the Court disregards Dr. Campbell's testimony about Respondent's Danger Assessment and supposed risk level as a subjective evaluation of subjective responses from Respondent whose flawed application and scoring reveals a lack of the methodological rigor required by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). *See* Fed. R. Evid. 702(d).

The Court agrees with the *Souratgar I* court that the Danger Assessment is a useful tool, not just for domestic violence advocates and clinicians working to reduce harm in intimate relationships by advising individuals of their potential risk and helping them safety-plan, but also to inform courts, law enforcement, and other state actors what the

statistical risk factors may be for domestic violence homicide, some of which are not necessarily intuitive. The Court therefore credits Dr. Campbell's general testimony about domestic violence dynamics, the impact of domestic violence in the home on children, and the risk factors enumerated in the Danger Assessment.

ii.    *Petitioner's Rebuttal Expert, Dr. Peter Favaro*

Petitioner proffered Dr. Peter Favaro as a rebuttal expert to respond to Dr. Campbell's testimony regarding grave risk of harm, including to testify about his forensic assessments of the Petitioner and Respondent and his observations of their interactions with the children. (Tr. 5/6/2025 580:25–581:9). A licensed psychologist in New York state, Dr. Favaro is a forensic psychology expert and custody evaluator and holds a B.A. in Psychology/Biology, an M.A. in Psychology, and a Ph.D. in School-Clinical Psychology. (ECF No. 86, PX41). Among other qualifications, he has testified as an expert witness in fourteen Hague Convention cases in multiple federal district courts. (ECF No. 84, PX39 at AR002009–10; Tr. 5/6/2025 578:3–20). The Court found Dr. Favaro to be qualified as an expert in the fields of children's psychology, intimate partner violence, domestic violence, forensic methodology, and risk of harm to children. (Tr. 5/6/2025 579:4–10).

Overall, the Court found Dr. Favaro credible. Dr. Favaro highlighted the weaknesses of using the Danger Assessment in a legal setting, including that it does not have predictive power to the degree of certainty required under *Daubert*, and that (as the Court noted above) its scoring is unreliable because it is a subjective interpretation of subjective responses. (Tr. 5/6/2025 587:24–590:13). Dr. Favaro explained that, instead, he uses a multi-method approach to assess domestic violence and child abuse in a forensic setting, including reviewing self-reported information, domestic violence-specific

16

questionnaires, psychological testing, and observations of the parents with the children. (Tr. 5/6/2025 590:14–19). In preparing his expert testimony, Dr. Favaro met separately with Petitioner and Respondent, interviewed each about their relationship, administered an MMPI-3 psychological test, and observed each party interact with the children. (Tr. 5/6/2025 590:20–595:12). Dr. Favaro testified that Petitioner scored within normal ranges on the MMPI-3 test, although he displayed elevated levels of defensiveness and impression management, which Dr. Favaro characterized as "a common finding in legal settings." (Tr. 5/6/2025 596:18–597:9). Respondent, however, engaged in so much impression management that her test results were invalidated, meaning "she wasn't as forthright as she could have been in her responses." (Tr. 5/6/2025 597:10–600:9). After observing each party interacting with the children, Dr. Favaro noted the children had very positive reactions to and seemed comfortable with both parents, and testified that he "didn't see anything in the interactions with the children and [he] didn't hear anything from either of them that gave [him] reason to believe that [the children] would be in danger in the company of either of them." (Tr. 5/6/2025 594:2–4, 600:22–601:1, 602:13–14). Nevertheless, in keeping with his testimony in other cases, Dr. Favaro noted that, "*if* the judge in this case makes a finding of domestic violence, *then*, if it's a pattern, it will present a grave risk to [the] children." (Tr. 5/6/2025 620:17–25 (emphasis added)). *Cf., e.g.*, *Keen v. Bowley*, No. 8:23-CV-02333 (JWH) (JDE), 2024 WL 3259040, at *47 (C.D. Cal. July 1, 2024) (listing Dr. Favaro's "if-then" expert opinions).

III.    <u>Procedural History</u>

On February 18, 2025, Petitioner filed a verified petition under the Hague Convention and ICARA, claiming Respondent wrongfully removed the children from

17

Jamaica to New York, and seeking the children's return to Jamaica. (Pet.) Petitioner also
sought a temporary restraining order prohibiting the children's removal from the District
and a preliminary injunction seeking their return to Jamaica. (ECF No. 8; ECF No. 8-2,
Petitioner's Show Cause Memorandum). On February 20, 2025, the Court granted the
temporary restraining order, enjoining Respondent from removing the children or causing
them to be removed from the District and New York City. (ECF No. 10). On February 28,
2025, Respondent filed an opposition to the show cause motion. (ECF No. 13). The Court
held a show cause hearing on March 3, 2025, at which the parties and their attorneys
appeared. (ECF No. 14). Respondent surrendered the children's U.S. and Jamaican
passports to the Court's custody, as ordered. (*Id.*) Upon both parties' consent, the Court
entered a consent preliminary injunction prohibiting the children's removal from the
District pending final determination on the merits. (ECF No. 16).

On March 13, 2025, Respondent filed an answer, presenting several defenses.
(ECF No. 17 ("Ans.")). Petitioner objected to the answer as untimely filed, and to several
of these defenses as not cognizable under the Hague Convention. (ECF Nos. 21, 27).
The Court deemed the answer timely filed (Order dated 3/27/2025) and stated it would
not entertain any motion to strike affirmative defenses from the answer (ECF No. 32).
After an adjournment, the bench trial was set for May 1 and 2, 2025. (ECF No. 26). The
parties submitted a joint pre-trial order (ECF No. 37) and pre-trial memoranda of law (ECF
No. 39, Respondent's Pre-Trial Memorandum of Law ("Resp't's Pre-Trial Br."); ECF No.
40, Petitioner's Pre-Trial Memorandum of Law ("Pet'r's Pre-Trial Br.")).

A three-day bench trial on the petition proceeded on May 1, 2, and 6, 2025. (ECF
Nos. 44, 47, 49). Eleven witnesses testified in person and via remote access: the parties

(in person); Elizabeth Riccio, LMSW, a licensed social worker who supervised one visitation between Petitioner and the children (remote); Allyson Mitchell, a family friend of the parties (remote); Jewel Reid, Petitioner's sister (in person); Dr. Ellen Weld, a psychologist who supervised two visitations between Petitioner and the children (remote); Elaine Remekie, Respondent's mother (in person); Simone Vaughn, Respondent's sister (in person); Beryl Harold, Respondent's aunt (in person); Dr. Jacquelyn C. Campbell, Respondent's expert (remote); and Dr. Peter Favaro, Petitioner's rebuttal expert (in person). The parties filed post-trial proposed findings of fact and conclusions of law, as well as all exhibits admitted into evidence. (ECF No. 102, Petitioner's Proposed Findings of Fact and Conclusions of Law ("Pet'r's Post-Trial Br."); ECF No. 112, Respondent's Corrected Proposed Findings of Fact and Conclusions of Law ("Resp't's Post-Trial Br."); ECF Nos. 52–86, 105–10 (Petitioner's exhibits); ECF Nos. 93–101 (Respondent's exhibits)).

## DISCUSSION

I.    Applicable Law

    A.   Hague Convention & ICARA

International child abduction cases are governed by the provisions of the Hague Convention as implemented by ICARA. Applying only to children under 16, the Hague Convention is designed "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Convention, preamble, art. 4.

In adjudicating a Hague Convention petition, a court has jurisdiction only over the wrongful removal claim and can "determine only [the parties'] rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4); *see also* Convention, art. 19; *Golan v. Saada*, 596 U.S. 666, 680–81 (2022); *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012).

iii.    *Prima Facie Case*

To prevail on a Hague Convention case claiming the wrongful removal or retention of a child, a petitioner must show by a preponderance of the evidence that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005); *see* 22 U.S.C. § 9003(b), (e)(1)(A).

"Habitual residence is determined as of the time of removal or retention." *Pozniak v. Shwartsman*, No. 20-CV-2956 (AMD) (RML), 2021 WL 965238, at *8 (E.D.N.Y. Mar. 15, 2021); Convention, art. 3. In cases such as this where the children resided from birth in Country A, then lived for an appreciable amount of time in Country B, before being brought back to Country A by the respondent parent, the court must determine whether the children's habitual residence remained in Country A or changed to Country B by the time of the removal.[9] "[A] child's habitual residence depends on the totality of the

---

[9] This is distinct from the "well-settled" defense, in which, even if the court determines the child's habitual residence changed to Country B by the time of the removal, if the child has now been living in Country A for more than a year, the respondent parent can try to establish that the child has now become so settled in Country A that ordering the return to Country B would uproot the child's life. *See* Convention, art. 12.

circumstances specific to the case," a fact-driven analysis. *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020). "Some factors for courts to consider in determining 'habitual residence' include where a child has lived, the length of time there, acclimatization, and the 'purposes and intentions of the parents.'" *Grano v. Martin*, 821 F. App'x 26, 27 (2d Cir. 2020) (*Grano II*) (quoting *Monasky*, 589 U.S. at 79), *aff'g* 443 F. Supp. 3d 510 (S.D.N.Y. 2020) (*Grano I*). When assessing whether the child has acclimated to the new country, courts have considered facts including: "a change in geography combined with the passage of an appreciable period of time"; the child's age, language proficiency, and academic, sports, and social activities; the "immigration status of child and parent"; the location of the child's "personal belongings"; and any other "meaningful connections with the people and places in the child's new country." *Monasky*, 589 U.S. at 78 n.3 (quoting HON. JAMES D. GARBOLINO, FED. JUD. CTR., THE 1980 HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION: A GUIDE FOR JUDGES 67–68 (2d ed. 2015)).

Although after *Monasky* the shared intent of the parents is no longer the primary factor to determine habitual residence, the questions from pre-*Monasky* cases assessing shared parental intent are still useful guidelines: Did the parents share a settled intention to abandon the previous habitual residence, and was there a mutual intent to adopt a new habitual residence? *Gitter*, 396 F.3d at 133–34; *see also Morales v. Restrepo*, No. 24-CV-7951 (NCM) (TAM), 2025 WL 939294, at *6 (E.D.N.Y. Mar. 28, 2025). "An actual agreement between the parents is not necessary to establish an infant's habitual residence" but can be inferred from the parents' actions. *Monasky*, 589 U.S. at 71; *see Ermini v. Vittori*, 758 F.3d 153, 162–63 (2d Cir. 2014) (holding that children's habitual residence changed where, even though family intended to move to new country for only

21

a couple years, parents' actions—leasing house in and moving belongings to new country, enrolling children in school and extracurriculars there, shifting critical medical care to new country—evinced shared intent "to shift the locus of their family life," even if temporarily). Courts should look to parental intent in part because it might "affect[] the length of time necessary for a child to become habitually resident, because the child's knowledge of these intentions is likely to color its attitude toward the contacts it is making." *Guzzo v. Cristofano*, 719 F.3d 100, 108–09 (2d Cir. 2013) (quoting *Ruiz v. Tenorio*, 392 F.3d 1247, 1254 (11th Cir. 2004)). Alleged domestic violence and coercive control may factor into the analysis if the evidence shows that "an infant lived in a country only because a caregiving parent had been coerced into remaining there." *Monasky*, 589 U.S. at 78. Nevertheless, "courts must not forget that *the core concern of 'habitual residence' is where a child normally or usually lives*." *Guzzo*, 719 F.3d at 109 (emphasis added). "Once a court 'can say with confidence' that the child has become settled into a new environment, habitual residence in that country is established." *Id.* (quoting *Gitter*, 396 F.3d at 134); *see also Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001) ("[A] child *can* lose its habitual attachment to a place even without a parent's consent."), *abrogated on other grounds by Monasky*, 589 U.S. 68.

Custody rights under the Convention include the right to determine the child's place of residence. Convention, art. 5(a); *see Abbott v. Abbott*, 560 U.S. 1, 10–12 (2010). The substance of those custody rights, however, is drawn from the laws of the child's habitual residence. Convention, art. 3(a); *Ozaltin v. Ozaltin*, 708 F.3d 355, 367 (2d Cir. 2013); *Tatari v. Durust*, No. 24-CV-6930 (CBA) (LKE), 2025 WL 327984, at *4 (E.D.N.Y. Jan. 29, 2025).

22

Although the petitioning parent must show they were actually exercising their custody rights to prevail, actual exercise is a liberal standard. Courts "have generally treated relatively minimal parental involvement as sufficient to establish the exercise of rights of custody." *Poix v. Susibel Altagracia Espaillat Santana*, No. 22 Civ. 4980 (JPC), 2022 WL 9847347, at *9 (S.D.N.Y. Oct. 17, 2022) (collecting cases finding actual exercise where the petitioning parent, for example, regularly visited or contacted the child, or provided financial support).

iv.    *Affirmative Defense: Grave Risk of Harm*

Even if the petitioner establishes all three elements of a prima facie case, the respondent may counter with one or more defenses that may defeat the claim, which the respondent must establish by either clear and convincing evidence or a preponderance of the evidence. *Grano I*, 443 F. Supp. 3d at 534 n.10; *see* 22 U.S.C. § 9003(e)(2). Respondent here asserts the "grave risk of harm" defense. (ECF No. 39 at 5–7). Under this defense, the adjudicating court "is not bound to order the return of the child if the [respondent] establishes that . . . (b) there is a grave risk that [the child's] return [to the habitual residence] would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b); *Golan*, 596 U.S. at 680 ("The Convention explicitly recognizes that the child's interest in avoiding physical or psychological harm, in addition to other interests, 'may overcome the return remedy.'" (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014))).

Importantly, the grave risk must be to the *child*, not the respondent. The Court notes the extensive social science research indicating that witnessing domestic violence can cause serious psychological harm to children. (*See* Tr. 5/6/2025 612:8–15 ("[W]hen

23

a child witnesses domestic violence, the research tends to indicate that given enough instances of that, the sequela[e] of observing domestic violence is the same as if the perpetrator performed that behavior on the children themselves."), 620:16–25 ("[I]f the judge in this case makes a finding of domestic violence, then, if it's a pattern, it will present a grave risk to children.")); *see also Saada v. Golan*, No. 18-CV-5292 (AMD) (LB), 2019 WL 1317868, at *18 (E.D.N.Y. Mar. 22, 2019) (citing expert testimony that exposure to domestic violence "disrupts a child's cognitive and social-emotional development, and affects the structure and organization of the child's brain"), *aff'd in part, vacated in part, remanded*, 930 F.3d 533 (2d Cir. 2019).

Nevertheless, under current Hague Convention case law, a respondent parent may not be able to establish the grave harm defense merely by alleging that the respondent herself experienced domestic violence at the petitioner's hand.[10] A history of domestic violence is relevant only "if it seriously endangers the child." *Souratgar II*, 720 F.3d at 103–04 ("The Article 13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm."). "'Sporadic or isolated incidents' of physically disciplining the child, 'or some limited incidents aimed at persons other than the child, even if witnessed by the child' are generally not grave risks of harm." *Saada*, 2019 WL 1317868, at *17 (quoting *Souratgar II*, 720 F.3d at 104); *Saavedra v. Montoya*,

---

[10] For discussions about and critiques of how the Hague Convention handles domestic violence, particularly where, as is most common, the petitioner has allegedly abused the respondent, see Adrienne Barnett, Miranda Kaye & Merle Hope Weiner, *The 2024 Forum on Domestic Violence and the Hague Abduction Convention*, 38 INT'L J. L., POL'Y & FAM., no. 1, Oct. 2024; Brenda Hale, *Taking Flight—Domestic Violence and Child Abduction*, 70 CURRENT LEGAL PROBS. 3, 3–16 (2017); and Shani M. King, *The Hague Convention and Domestic Violence: Proposals for Balancing the Policies of Discouraging Child Abduction and Protecting Children from Domestic Violence*, 47 FAM. L.Q. 299 (2013).

No. 21-CV-5418 (EK) (VMS), 2023 WL 2910654, at *16–20 (E.D.N.Y. Apr. 12, 2023) (analyzing case law regarding risk of harm from exposure to spousal abuse), *appeal withdrawn*, No. 23-694, 2023 WL 5600054 (2d Cir. Aug. 4, 2023); *see also Armand v. Armand*, No. 4:24-CV-974 HEA, 2025 WL 1249420, at *8 (E.D. Mo. Apr. 30, 2025) ("[T]he Court does not condone Petitioner's conduct, but evidence of yelling, name calling, and one incident of physical aggression that did not result in bodily injury is not enough to establish by clear and convincing evidence that the children will face grave risk of harm if they are returned to [the country of habitual residence]."). By contrast, in cases where courts have denied repatriation, typically either (1) the domestic violence was "serious, recurring, and (at times) perpetrated in the presence of the child," *Mene v. Sokola*, No. 22 Civ. 10333 (KPF), 2024 WL 4227788, at *18 (S.D.N.Y. Sept. 17, 2024) (collecting district court cases), *reconsideration denied*, 2025 WL 1727268 (S.D.N.Y. June 23, 2025), or (2) "the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question," *Souratgar II*, 720 F.3d at 105 (collecting circuit cases).

A district court that finds there is a grave risk of harm may exercise its discretion to decide "whether to consider ameliorative measures that could ensure the child's safe return," even in the face of grave harm. *Golan*, 596 U.S. at 678 (holding that considering ameliorative measures after a finding of grave risk is discretionary, not mandatory). Examples of ameliorative measures include: that the parents would not live together upon return to the habitual residence, thus reducing the possibility of domestic violence; that the country of habitual residence has robust measures to protect the child's continued well-being; that the petitioner would financially support the respondent to ease the transition back to the habitual residence. *See Saada v. Golan*, 712 F. Supp. 3d 361, 363

(E.D.N.Y. 2024), *on remand from Golan*, 596 U.S. 666, *appeal withdrawn*, No. 24-468, 2024 WL 2716485 (2d Cir. Mar. 20, 2024).

### B. Jamaican Custody Law

Under Jamaican law, "any person who is the parent[11] or legal guardian of a child, or who is legally liable to maintain the child, shall be presumed to have custody of the child, and as between father and mother, neither shall be deemed to have ceased to have such custody by reason only that the father or mother has deserted, or otherwise does not reside with, the other parent and the child." Jamaican Child Care & Protection Act § 2(4)(a) (2004) ("CCPA"). Custody rights include: "rights relating to the care of the person of a child and in particular, the right to determine the child's place of residence." Jamaican Children (Guardianship and Custody) Amendment Act (2017) ("CGCAA"). *See also Dacres v. McGowan*, No. 3:23-cv-0527 (SVN) (D. Conn. Dec. 9, 2022), ECF No. 9-1 (letter from Charles Young, Attorney-at-Law, Jamaica Central Authority, dated Sept. 27, 2022, citing CCPA and CGCAA).

## II.    Conclusions of Law

### A. Petitioner's Prima Facie Case

### i.    *Habitual Residence: The First* Gitter *Factor*

As established above, Respondent brought the minor children from Jamaica to New York on January 24, 2025. The Court finds, based on the findings of fact set forth

---

[11] The fact that the child's biological parents were never married does not impact the analysis of whether a petitioner has custody rights under Jamaican law and was exercising such rights at the time of the child's removal. *See Chambers v. Russell*, No. 1:20-CV-498, 2020 WL 5044036, at *7 (M.D.N.C. Aug. 26, 2020) (noting parties did not dispute that both petitioner and respondent had equal custody rights under Jamaican law where petitioner mother and respondent father had never married, had no formal custody order, but informally shared responsibility for child's physical and other care).

above and the analysis below, that Jamaica was the children's country of habitual residence immediately before removal.

The Court agrees with Respondent that as of December 2023 the children's habitual residence was New York. Although the children and Respondent had spent the summer of 2023 in Jamaica living with Petitioner in his home, and visited Jamaica a couple more times that year, they always returned to New York. (*See* ECF Nos. 53–56, PX3–PX6 (the children's U.S. and Jamaican passports)). Indeed, Petitioner himself implies as much in an email exchange with Respondent on December 1, 2023, in which the parties discussed their plans for the future: "What exactly is the intention for this January [2024]? *Are you intending to move permanently with the children to Jamaica* and for us to have them settled and enrolled in school as was discussed previously and agreed?" (ECF No. 75, PX25 at AR000065 (emphasis added)).[12]

Respondent argues that because she and Petitioner never shared an intent to change their habitual residence to Jamaica, the habitual residence remained in New York through to the present. (Resp't's Post-Trial Br. at 16–17). Respondent relies on several factors. First, Respondent emphasizes the parties had ongoing discussions about their future plans, but that they never reached any agreement. The primary evidence for this is Respondent's email to Petitioner in January 2024 laying out two alternative plans for where the family would live. (ECF No. 76, PX27; *see* Tr. 5/2/2025 386:8–392:16). In Plan A, which was contingent on Respondent getting a job in Jamaica or a remote job by early

---

[12] Respondent replied on December 20, 2023, "There's nothing more that I want than staying here; making our family in one place," but that "I would still need to return to NY to at least give in my resignation if I am selected for the position [a remote job]." (ECF No. 75, PX25 at AR000056). She elaborated on this contingency in an email dated January 5, 2025, laying out "Plan A" and "Plan B," discussed below. (ECF No. 76, PX27 at AR000071).

2024, Respondent and the children would move to Jamaica permanently to live with Petitioner. (Tr. 5/2/2025 389:15–391:17). However, as to Plan B, Respondent claims the parties failed to specify where Respondent and the children would live if she were unable to secure a satisfactory Jamaican or remote job by early 2024. (Tr. 5/2/2025 391:18–392:10). Respondent argues that because she never found employment in Jamaica, Plan A never materialized, and so, because Plan B was never clarified, the parties never shared an intent to change the children's habitual residence from New York to Jamaica. (Resp't's Post-Trial Br. at 16–17).

Second, Respondent states that she merely took a leave of absence from her New York-based social work employment, rather than resign, and re-started the same position in January or February 2025 after she returned to New York. (Tr. 5/2/2025 349:20–352:18, 412:4–414:20; ECF No. 110, PX28-F at AR001756).

Third, Respondent argues she was coerced into having the children remain in Jamaica from January 2024 through June 2024, thus those months in Jamaica cannot be considered circumstantial evidence of a shared intent to change the habitual residence to Jamaica. (Resp't's Post-Trial Br. at 17–20 (citing *Monasky*, 589 U.S. at 78)). She avers that Petitioner hid the children's passports from her from December 2023 or January 2024 through June 2024, so she was unable to leave Jamaica with the children during that time. (Tr. 5/2/2025 404:20–25). Respondent's mother and sister testified to the same. (Tr. 5/2/2025 314:3–21, 325:20–24). On April 24, 2024, Respondent emailed the U.S. Embassy and Department of State to ask for help to recover the passports, characterizing her relationship with Petitioner as abusive. (ECF No. 92, RXC).

28

Petitioner counters that Jamaica was the children's habitual residence as of the date of removal. (Pet'r's Post-Trial Br. ¶¶ 170–200). According to Petitioner, the parties shared a mutual intent that Respondent and the children would move permanently to Jamaica. (*Id.* ¶ 188). Throughout their relationship Respondent expressed a desire to reside in Jamaica permanently (Tr. 5/1/2025 36:12–17, 39:16–18, 53:4–9, 130:8–12, 232:5–10; Tr. 5/6/2025 532:23–533:1); since at least January 2022 and continuing through 2024, she had actively discussed and sought remote or Jamaican-based employment so she could relocate to Jamaica (*e.g.*, ECF No. 106, PX28-B at AR000505; Tr. 5/6/2025 534:8–13, 538:11–543:19); and as early as May 2022 she had discussed resigning from her New York-based school social work position (ECF No. 107, PX28-C at AR000777; Tr. 5/6/2025 533:8–534:3), eventually taking a leave of absence in March 2024 (Tr. 5/2/2025 412:4–414:20). She also harbored dreams of starting a business in Jamaica and, with Petitioner's encouragement, developed business proposals for a space for children's play therapy and a bridal shop. (Tr. 5/1/2025 59:22–61:7; Tr. 5/6/2025 537:16–538:10; *see e.g.*, ECF No. 110, PX28-F at AR001588–89, AR001756, AR001778, AR001825). She applied for a taxpayer registration number (TRN) in Jamaica. (Tr. 5/6/2025 544:25–545:14). Respondent assisted Petitioner in choosing the house in Kingston he purchased for the family, was involved in selecting furniture and décor, and referred to it as "our home." (Tr. 5/1/2025 59:12–21, 135:14–23, 194:9–195:2, 196:16–24, 198:9–23, 199:7–200:4). The parties shipped several barrels of the children's belongings and items for the apartment from New York to Jamaica (Tr. 5/6/2025 522:12–23, 528:9–19), and hired two nannies in Jamaica to assist with childcare (Tr. 5/1/2025

95:10–11). The Court credits the above facts as circumstantial evidence of Respondent's intention to move to Jamaica.

Regarding the allegation that Petitioner hid the children's passports from Respondent, Petitioner counters that Respondent did not request the passports until early May 2024, and that shortly thereafter he moved the passports to a mutually accessible location. (Tr. 5/1/2025 168:2–8, 172:12–173:9; Pet'r's Post-Trial Br. ¶ 124; ECF No. 110, PX28-F at AR001795). Even if the Court were to credit Respondent's testimony about Petitioner hiding the children's passports and conclude that Respondent was coerced into keeping the children in Jamaica from January through June 2024, this passport-related coercion cannot explain why Respondent remained in Jamaica from June 2024 through January 2025, even after she regained access to the passports. Indeed, Respondent took not one but two trips alone with the children back to the United States—two weeks in Florida in July 2024, and one week in New York in September 2024—spending time separate from Petitioner and surrounded by her family. (Tr. 5/2/2025 315:8–317:8). As Dr. Favaro opined, these two independent trips are relevant to determining whether Respondent was entrapped in an abusive relationship. (Tr. 5/2/2025 631:23–632:22, 636:13–637:7). To be sure, Petitioner exhibited controlling tendencies in this relationship (*see, e.g.*, Tr. 5/1/2025 92:23–24 (noting he believes in "discipline," "order," and "structure")), and the Court certainly does not condone all his decisions and actions, not the least his actions in the altercation on December 26, 2024. However, the Court does not find that his behavior so "obliterated her decision-making power" that Respondent's time in Jamaica in 2024 was involuntary for purposes of determining habitual residence. *See Grano I*, 443 F. Supp. 3d at 541.

Petitioner also emphasizes compelling evidence that the children have acclimated to life in Jamaica (Pet'r's Post-Trial Br. ¶¶ 191–97), meaning that even if Respondent did not herself intend to move to Jamaica permanently, the children nonetheless became settled there. *See Koch v. Koch*, 450 F.3d 703, 718 (7th Cir. 2006) ("It is entirely natural and foreseeable that, if a child goes to live with a parent in that parent's native land on an open-ended basis, the child will soon begin to lose its habitual ties to any prior residence. A parent who agrees to such an arrangement without any clear limitations may well be held to have accepted this eventuality." (quoting *Mozes*, 239 F.3d at 1082)). As of the date of removal, A.A.F.R. was approximately 3.5 years old, and A.A.-A.R. was approximately 2 years old. (ECF No. 54, PX4; ECF No. 56, PX6). As both Jamaican and U.S. citizens (Tr. 5/1/2025 12:14–15), A.A.F.R. has spent almost a third of her life in Jamaica, and A.A.-A.R. has spent half of his. In Jamaica, the children attend daycare and extracurricular activities, receive routine medical and dental care, and participate in playdates and family and cultural activities. (Tr. 5/1/2025 61:9–62:20, 63:1–17, 64:10–12, 68:24–69:6, 69:25–70:5, 70:20–22, 90:7–13, 90:16–21, 91:7–12; ECF Nos. 59–73, PX9–PX23). Both Petitioner and Respondent have extended family in Jamaica, and the children spend frequent quality time with these relatives, particularly Petitioner's. (Tr. 5/1/2025 79:23–80:25, 81:24–82:12, 248:4–23). The evidence demonstrates that after December 2023 and as of January 24, 2025, the children became settled in Jamaica and fully integrated into Jamaican life. Combined with the at-best equivocal evidence from Respondent that she did not intend for the children to move their habitual residence to Jamaica, which is not supported by circumstantial evidence, this evidence of acclimation

31

indicates that the children's habitual residence had changed from New York to Jamaica
by January 2025.

Given the facts discussed above, the Court determines "with confidence," *Guzzo*,
719 F.3d at 109 (quoting *Gitter*, 396 F.3d at 134), that Petitioner has established by a
preponderance of the evidence that Jamaica was the children's habitual residence at the
time of removal.

ii.     *Breach and Actual Exercise of Custody Rights: The Second and Third* Gitter
        *Factors*

Although the second and third *Gitter* factors are not in dispute, Petitioner still bears
the burden to establish all prima facie elements by a preponderance of the evidence.
Looking to the laws of Jamaica, the children's habitual residence, the Court finds the
removal from Jamaica to New York was in breach of Petitioner's Jamaican custody right
as the biological father to determine where the children reside. *See* CCPA § 2(4)(a)
(2004); CGCAA. Based on the above findings of fact, including that Petitioner lived with
the children in Jamaica and actively participated in caring for them, the Court finds
Petitioner was actually exercising his custody rights at the time of removal. *See Poix*,
2022 WL 9847347, at *9.

*        *        *

Because Petitioner has established by a preponderance of the evidence that
Jamaica was the children's habitual residence at the time of removal to New York, that
the removal breached Petitioner's custody rights under Jamaican law, and that Petitioner
was actually exercising such rights at the time of removal, Petitioner has successfully

established a prima facie case for wrongful removal under the Hague Convention and ICARA.

B. <u>Respondent's Grave Risk of Harm Defense</u>

Given Petitioner's successful prima facie case, Respondent may avoid return of the children to Jamaica only by establishing an enumerated defense under the Hague Convention. In her papers and at trial, Respondent alleged only one defense: grave risk of harm. (*See* Ans.; Resp't's Pre-Trial Br. at 5–7). Respondent argues that, because of Petitioner's history of domestic violence against Respondent, including physical and psychological abuse, the children would face a grave risk of harm should they be returned to Jamaica. (Resp't's Pre-Trial Br. at 5–7; Tr. 5/6/2025 523:12–22).

Both parties referred to their relationship as "highly conflicted" but disagreed over whether it amounted to abuse. (*See* Tr. 5/6/2025 505:25–506:2). Respondent states Petitioner frequently belittled her, questioned her judgment and parenting skills, and made her "feel invisible." (*See, e.g.*, ECF No. 110, PX28-F at AR001952). Additionally, she alleges three instances of physical abuse: In June 2023, Petitioner pushed Respondent to the bed three times and barred her from leaving the bedroom during an argument; in August 2023, Petitioner grabbed her phone during an argument; and on December 26, 2024, after Respondent pushed Petitioner during an argument, Petitioner pushed her to the ground and grabbed her shirt collar, which Respondent alleges caused a bruise on her neck. (Tr. 5/2/2025 419:18–427:3). Overall, aside from these specific allegations, Respondent's other statements about the abuse are conclusory. (*E.g.*, ECF No. 98, RXI (answer to question 18 on the Danger Assessment: "Do you believe he is capable of killing you? 'absolutely'"); Tr. 5/2/2025 431:4–9; Tr. 5/6/2025 499:7–13, 502:15–20).

Respondent's expert, Dr. Campbell, testified that Respondent is at "severe danger" of being killed by Petitioner, based on Respondent's answers on the Danger Assessment. (Tr. 5/2/2025 452:5–14). As discussed above, this particular Danger Assessment is not a credible predictor of Respondent's lethality risk: Dr. Campbell incorrectly and subjectively scored it, improperly adding two points and thus raising the score from at most "increased danger" to "severe danger"; and the assessment relies entirely on Respondent's subjective responses, several of which the Court doubts. (*E.g.*, ECF No. 98, RXI ("Do you believe he is capable of killing you? 'absolutely'")). While the Court takes into consideration the general risk factors highlighted by the Danger Assessment and Dr. Campbell's testimony about domestic violence dynamics, which accords with Dr. Favaro's, the Court does not credit Dr. Campbell's Danger Assessment score or testimony about Respondent's specific risk.

Overall, the Court largely credits Respondent's allegations of emotional and physical abuse. Nevertheless, the standard under the Hague Convention requires a respondent to establish by clear and convincing evidence that *the children* are at grave risk of harm upon return to the habitual residence. This, Respondent fails to do.

Asked on direct examination how she believed the children "would be at risk of direct harm if they were to be returned to Jamaica," Respondent answered that Petitioner "believes in hitting them" as discipline, and that A.A.F.R. keeps referring to the December 26, 2024, incident. (Tr. 5/6/2025 523:12–22; *see also* Tr. 5/6/2025 514:2–515:13 (noting the child repeats "daddy pushed mommy to the ground"); Tr. 5/2/2025 402:10–14 ("Q: How do you believe that returning the children to Jamaica would [a]ffect your children's psychological well-being, if at all? A: Because [A.A.F.R.] has repeatedly said. . . daddy,

you pushed mommy to the ground.")). Regarding the first concern, Petitioner credibly explained his disciplinary style as at most "gently tapping hands or on the bottom," which he distinguished from "spanking," and which the Court does not interpret to be abusive behavior that rises to the level of grave risk of harm. (Tr. 5/1/2025 96:9–98:3). After first explaining that "children who have been abused or beaten often exhibit behaviors like hand shyness," Dr. Favaro stated he did not see or hear anything in Petitioner's interactions with the children "that gave [him] reason to believe they would be in danger in the company of either" parent, and that the children appeared "perfectly comfortable with both parents." (*See* 5/6/2025 591:2–14, 600:13–601:2, 602:13–14). This supports a finding that Petitioner does not engage in abusive corporal punishment.

For the latter concern, the Court viewed a video of the daughter allegedly recounting the December 26, 2024, incident but does not credit it as the child was asked leading questions. (Tr. 5/6/2025 526:1–21). Furthermore, Dr. Weld denied hearing the child mention the incident during a visitation she supervised. (Tr. 5/2/2025 277:19–278:20). Given that the child may have been coached, the Court does not fully credit the allegations that A.A.F.R. continues repeating that statement.

As Dr. Favaro testified, social science research indicates that exposure to intimate partner violence typically harms a child. (Tr. 5/6/2025 612:8–15, 620:16–25). However, binding Second Circuit precedent holds that a Hague Convention respondent cannot establish *grave risk* of harm merely by alleging "sporadic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child." *Souratgar II*, 720 F.3d at 100–06 (affirming return order despite crediting district court's findings that petitioner abused respondent, including

by "shouting and offensive name-calling, and [in] several incidents of physical abuse in which he kicked, slapped, grabbed, and hit" her, because "there [was] nothing in the record beyond speculation that [the child] would suffer unavoidable psychological harm" (internal quotations omitted)); *see also Saada*, 2019 WL 1317868, at *17. Here, there are at most only "limited incidents" of alleged intimate partner violence, which legally cannot rise to the level of grave risk of harm.

Finally, nowhere does Respondent assert Petitioner is a bad father or that the children are afraid of him. In her WhatsApp messages and trial testimony, she repeatedly states he is a "great father." (*E.g.*, ECF No. 110, PX28-F at AR001788; Tr. 5/2/2025 401:11–12 (Respondent testified "Audley is a great dad"), 335:23–336:8 (Respondent's mother denied ever hearing Respondent call Petitioner a "bad father to the children")). Each witness who observed interactions between the children and Petitioner reported that the children were happy to see their father and exhibited no signs of fear. (*E.g.*, Tr. 5/1/2025 117:9–17 (Ms. Riccio reported, during a supervised visitation, the children were "very happy to see their father"); Tr. 5/2/2025 273:9–15 (Dr. Weld reported, during a supervised visitation, the children "were very happy, ecstatic, they ran up to their father, hugged him, laughed, giggled. It was very joyful."); Tr. 5/6/2025 593:8–24 (Dr. Favaro reported, during a 45-minute observation session in his office, that the children were "very happy" and "very affectionate" towards their father)). Moreover, the children lived alone with Petitioner in Jamaica from January to March 2024 while Respondent was in New York resigning from her job, and there is no evidence that the children were neglected or harmed during that time.

36

In light of the above, the Court determines that Respondent has not established by clear and convincing evidence that the children would face a grave risk of harm upon return to Jamaica.

III.    Costs and Fees

As required by the fee-shifting provision in ICARA, because the Court has ordered the return of the children, Petitioner's costs and fees shall be awarded pursuant to 22 U.S.C. § 9007(b)(3) unless Respondent shows that such an award would be "clearly inappropriate." 22 U.S.C. § 9007(b)(3). Because the matter is not yet fully briefed, the Court reserves ruling on Petitioner's entitlement to attorney's fees. Accordingly, Petitioner is directed to file, within fourteen (14) days of this Memorandum Opinion and Order, an application detailing the services rendered, expenses incurred, supporting authority for, and documentation of all fees and costs requested. *See* Fed. R. Civ. P. 54(d)(2)(B)(i). Respondent must file any opposition or response within fourteen (14) days from the date of service of Petitioner's submission. Petitioner may file a reply within seven (7) days from the date of service of Respondent's opposition or response. Unless Respondent establishes that the requested award is "clearly inappropriate," the Court will enter an appropriate monetary award of attorney's fees, costs, and expenses pursuant to ICARA. *See Navarro Parra v. Villalonga Camargo*, No. 3:24-CV-1290-L, 2025 WL 992581, at *10 (N.D. Tex. Apr. 2, 2025).

## CONCLUSION

For the reasons set forth above, the Court GRANTS the petition and orders the children, A.A.F.R. and A.A.-A.R., to be returned to Jamaica. The Clerk of Court is

respectfully directed to enter judgment in favor of Petitioner. The parties shall submit a joint proposed order of return by July 7, 2025.

SO ORDERED.


Hon. Ramón E. Reyes, Jr.    Digitally signed by Hon. Ramón E. Reyes, Jr.
                            Date: 2025.06.26 14:51:13 -04'00'

_____

RAMÓN E. REYES, JR.
United States District Judge

Dated: June 26, 2025
        Brooklyn, NY